Embassy of the United States of America

## Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition

## AMERICAN FOREIGN SERVICE

Ottawa, Canada, December 4, 2007
(Place and date)

Keith Powell, II, Consul General of the United States of America at Ottawa, Canada, hereby
that the annexed papers, being supporting documents, proposed to be used upon an application
extradition from the United States of Wilbur James Ventling (aka John James Stewart; Dennis
an; Wilburn Hamilton; Wilbur James Schwope), wanted to stand trial on a count of rape contrary
144 of the Criminal Code and one count of causing bodily harm with intent contrary to
of the Criminal Code, alleged to have been committed in the Province of British Columbia,
and legally authenticated so as to entitle them to be received in evidence for similar
by e tribunals of Canada, as required by Title 18, United States Code, Section 3190.

whereof I hereunto sign my name and cause my seal of office to be
affixed th of December, 2007.

Keith Powell, II
Consul General of the
United States of America

- 2 -

THAT Paige Lyn Johnstone Q.C. whose original signature appears at the end of the Affidavit and exhibits thereto of DAVID M. RUSE is a Lawyer and a Notary Public and a Commissioner for taking Affidavits in and for the Province of British Columbia, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

THAT Cst. Lynn Kolibaba whose original signature appears at the end of the Affidavit and exhibits thereto of KEVIN JOSEPH CYR, is a Regular Member of the Royal Canadian Mounted Police in Vernon, British Columbia and Commissioner for taking the Affidavits in and for the Province of British Columbia, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

THAT Brenda Holtskog, who certified the copies of the Information and Warrant for Arrest, is a Justice of the Peace of the Supreme Court of British Columbia, in and for the Province of British Columbia, having been duly appointed to that office, and as such is empowered to certify such documents of the said court.

The Seal of the Minister of Justice of Canada is hereby affixed this 30 day of November, 2007.

_____
Claude LeFrançois

PROVINCE OF BRITISH COLUMBIA

CANADA

I HEREBY CERTIFY that the attached copy of the Affidavit of David M.

Ruse, sworn the 27th day of November, 2007 is a true and correct copy of the

original document.

DATED at the City of Kelowna, Province of British Columbia, Canada, this

27th day of November, 2007.

Paige Lyn Johnstone Q.C.,
A Commissioner for taking Affidavits
within the Province of British Columbia

| | | |
|---|---|---|
| **CANADA** | ) | **IN THE MATTER OF AN** |
| | ) | **APPLICATION FOR THE** |
| **PROVINCE OF** | ) | **EXTRADITION FROM THE** |
| | ) | **UNITED STATES TO** |
| **BRITISH COLUMBIA** | ) | **CANADA OF WILBUR** |
| | ) | **JAMES VENTLING WHO** |
| **CITY OF KELOWNA** | ) | **STANDS CHARGED IN** |
| | ) | **CANADA WITH THE** |
| | ) | **OFFENCES OF:** |
| | ) | **RAPE AND CAUSING** |
| | ) | **BODILY HARM.** |

## AFFIDAVIT

1. I, David M. Ruse, am a Barrister and Solicitor practicing law in the Province of British Columbia, Canada. I am employed as a Crown Counsel with the Criminal Justice Branch of the Ministry of the Attorney General of British Columbia, Canada, which is responsible for the conduct of criminal prosecutions in the Province of British Columbia.

2. I have practiced criminal law since November 1, 1991, and since that date I have been employed as Crown Counsel for the Ministry of Attorney General for British Columbia, Canada, practicing exclusively in the field of criminal law. I have conducted hundreds of prosecutions on behalf of the Ministry of Attorney General for British Columbia, Canada. As a prosecutor, I am an expert in the field of the criminal law of Canada. I am responsible for the prosecution of Wilbur James VENTLING.

3. Canada is seeking the extradition of Wilbur James VENTLING ("VENTLING"), date of birth December 10, 1944, also known as John James STEWART ("STEWART") on the following charges:

   Count 1. Wilbur James VENTLING, aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, did have sexual intercourse with Tavin Christine SOMERSET, a female person not his wife, without her consent, and thereby did commit the offence of rape, contrary to Section 144 of the Criminal Code.

   Count 2. Wilbur James VENTLING, aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, with intent to wound Tavin Christine SOMERSET, did cause bodily harm to Tavin Christine SOMERSET, contrary to Section 228 of the Criminal Code.

4. On June 5th, 2007, Wilbur James VENTLING was charged with two counts of breaches of the criminal law of Canada. Attached hereto as Exhibit "A" is a certified true copy of Information 33836-C-3, charging Wilbur James VENTLING with two counts of offences against the Criminal Code of Canada. Exhibit "A" was sworn on June 5th, 2007 at Vernon, British Columbia, Canada, by Cst. Kevin Cyr, a peace officer and a regular member of the Royal Canadian Mounted Police stationed at Vernon British Columbia, Canada. Exhibit "A" was sworn before B. Holtskog, a Justice of the Peace of the Province of British Columbia.

5. Attached hereto as Exhibit "B" to this my affidavit is a certified and true copy of the Warrant for  Arrest of Wilbur James VENTLING for the charges contained in Exhibit "A", which Warrant for Arrest was issued on June 5th, 2007 at Vernon, Province of British Columbia, by Justice of the Peace Holtskog.

6. Under the Criminal Code of Canada, criminal offences are divided into three categories: indictable offences, summary conviction offences, and offences that are, at the election of the prosecution, either indictable or summary conviction (hereinafter "hybrid offences"). Canadian law has abolished the common law division of offences into felonies and misdemeanors. However, indictable offences are roughly equivalent to felonies and summary conviction offences are roughly equivalent to misdemeanors. Generally speaking, indictable offences are more serious offences carrying more severe penalties, and summary conviction offences are less serious offences carrying less severe penalties.

7. The maximum penalty for the indictable offence of Rape, as charged in Count 1, is imprisonment for life.

8. The maximum penalty for the indictable offence of Causing Bodily Harm With Intent, as charged in Count 2, is imprisonment for 14 years.

9. The criminal law of Canada has been codified within the Criminal Code of Canada. Both the offences alleged in Exhibit "A" are violations of the Criminal Code of Canada and thus criminal offences.

10. Count 1 as set out in Exhibit "A" charges Wilbur James VENTLING with having committed the crime of rape. Section 143 and 144 of the Criminal Code of Canada, Revised Statutes of Canada 1970, Chapter C-34 (hereinafter cited: R.S.C. 1970, c. C-34) provides as follows:

RAPE

143. A male person commits rape when he has sexual intercourse with a female person who is not his wife,
    (a) without her consent, or
    (b) with her consent if the consent
        (i) is extorted by threats or fear of bodily harm,

       (ii) is obtained by personating her husband, or
       (iii) is obtained by false and fraudulent representations as to
           the nature and quality of the act.

PUNISHMENT FOR RAPE

    144. Every one who commits rape is guilty of an indictable offence and
       is liable to imprisonment for life.

11. Sections 143 and 144 of the Criminal Code of Canada R.S.C. 1970, c. C-34 were in full force and effect when Wilbur James VENTLING is alleged to have committed rape as charged in Count 1 as set out in Exhibit "A".

12. The provisions of the Criminal Code of Canada creating the offence of rape, Section 144, R.S.C. 1970, c. C-34, were in full force and effect on the date set out in Count 1 of Exhibit "A". By virtue of the Statutes of Canada 1980-1981-1982, c. 125 (hereinafter cited: S.C. 1980-1981-1982, c. 125), the specific crime of rape as embodied and contained in Section 144 of the Criminal Code of Canada, R.S.C. 1970, c. C–34, was repealed as of January 4, 1983. In Canadian law, the repeal of a criminal offence does not affect the prosecution of an individual or any criminal proceeding with respect to such individual who is alleged to have committed such criminal offence while the statutory provisions creating the offence was in full force and effect. Therefore, there is no bar in Canadian law from commencing or continuing a criminal proceeding in relation to indictable criminal offences committed when the statutory provisions creating those indictable offences were in full force and effect.

13. Section 35 of the Interpretation Act, R.S.C. 1970, c. I-23. embodies and contains the following:

    35. Where an enactment is repealed in whole or in part, the repeal does
      not
      (a) Revive any enactment or anything not in force or existing at the
         time when the repeal takes effect;
      (b) Affect the previous operation of the enactment so repealed or
         anything duly done or suffered thereunder;
      (c) Affect any right, privilege, obligation or liability acquired, accrued,
         accruing or incurred under the enactment so repealed;
      (d) Affect any offence committed against or a violation of the
         provisions of the enactment so repealed, or any penalty,
         forfeiture or punishment incurred under the enactment so
         repealed; or
      (e) Affect any investigation, legal proceeding or remedy as in respect
         to any such right, privilege, obligation, liability, penalty, forfeiture
         or punishment;

    and an investigation, legal proceeding or remedy as described in

paragraph (e) may be instituted, continued or enforced, and the penalty, forfeiture or punishment may be imposed as if the enactment had not been so repealed.

14. On December 12, 1988, the Revised Statutes of Canada, 1985 came into force and thereby the Interpretation Act, R.S.C. 1985, c. I-21 replaced the Interpretation Act, R.S.C. 1970, c. I-23. Section 35 of the Interpretation Act, R.S.C. 1970, while remaining unchanged in substance, was renumbered and with minor amendments became the Interpretation Act, R.S.C. 1985, c. I-21, and embodies and contains as follows:

   43.  Where an enactment is repealed in whole or in part, the repeal does not
   (a) revive any enactment or anything not in force or existing at the time when the repeal takes effect,
   (b) affect the previous operation of the enactment so repealed or anything duly done or suffered thereunder,
   (c) affect any right, privilege, obligation or liability acquired, accrued, accruing or incurred under the enactment so repealed,
   (d) affect any offence committed against or contravention of the provisions of the enactment so repealed, or any punishment, penalty or forfeiture incurred under the enactment so repealed, or
   (e) affect any investigation, legal proceeding or remedy in respect of any right, privilege, obligation or liability referred to in paragraph (c) or in respect of any punishment, penalty or forfeiture referred to in paragraph (d),

   and an investigation, legal proceeding or remedy as described in paragraph (e) may be instituted, continued or enforced, and the punishment, penalty or forfeiture may be imposed as if the enactment had not been so repealed.

15. It is my expert legal opinion that Section 35 of the Interpretation Act, R.S.C. 1970, c. I-23, and Section 43 of the Interpretation Act, R.S.C. 1985, c. I-21, preserves the validity of charges laid under Section 144 of the Criminal Code of Canada, R.S.C. 1970, c. C-34, relating to acts committed prior to January 4, 1983 and preserves the criminal proceedings against Wilbur James VENTLING with respect to Count 1 on Exhibit "A".

16. Furthermore, it is my professional opinion that the conduct which would constitute the crime as defined in Section144 of the Criminal Code of Canada, R.S.C. 1970, c. C-34, is subsumed into the offence of sexual assault provided by Section 246.1 of the Criminal Code of Canada which came into force on January 4, 1983, by virtue of Section 19, S.C. 1980-1981-1982, c. 125. Section 246.1 of the Criminal code of Canada embodies and contains the following:

SEXUAL ASSAULT – No Defence

246.1(1)  Every one who commits a sexual assault is guilty of
      (a) an indictable offence and is liable to imprisonment for ten
          years; or
      (b) an offence punishable on summary conviction.

    (2)  Where an accused is charged with an offence under
subsection (1) or section 246.2 or 246.3 in respect of a
person under the age of fourteen years, it is not a defence
that the complainant consented to the activity that forms the
subject-matter of the charge unless the accused is less than
three years older than the complainant.

17. On December 12, 1988, the Revised Statutes of Canada 1985 came into force
and thereby Section 246.1(1)(a) of the Criminal Code of Canada, R.S.C. 1970,
while being unchanged in content was renumbered and became Section 271(1)(a)
of the Criminal code of Canada, R.S.C. 1985, c. C-46. Section 246.1(2) was
replaced by Section 150.1(1) of the Criminal Code of Canada, R.S.C. 1985, c. C-
46, which embodies and contains as follows:

150.1(1) Where an accused is charged with an offence under Section
151 or 152 or subsection 153(1), 160(3) or 173(2) or is
charged with an offence under Section 271, 272 or 273 in
respect of a complainant under the age of fourteen years, it is
not a defence that the complainant consented to the activity
that forms the subject matter of the charge.

18. Because the conduct which would constitute the crime of rape was subsumed into
the offence of sexual assault as described in paragraph 16 above, the offence as
set out in Count 1 of Exhibit "A" not only constituted a breach of the Criminal Code
of Canada on the date set out in the Count, but continues to be a criminal offence.

19. Count 2 as set out in Exhibit "A" charges Wilbur James VENTLING with having
committed the crime of causing bodily harm with intent. Section 228 of the
Criminal Code of Canada, Revised Statutes of Canada 1970, Chapter C-34
(hereinafter cited: R.S.C. 1970, c. C-34) provides as follows:

CAUSING BODILY HARM WITH INTENT

228.  Every one who, with intent
    (a) to wound, maim, or disfigure any person,
    (b) to endanger the life of any person, or
    (c) to prevent the arrest or detention of any person,
    discharges a firearm, air gun or air pistol at or causes bodily
    harm in any way to any person, whether or not that person is the
    one mentioned in paragraph (a), (b), or (c), is guilty of an

indictable offence and is liable to imprisonment for fourteen years.

20. Section 228 of the Criminal Code of Canada R.S.C. 1970, c. C-34 was in full force and effect when Wilbur James VENTLING is alleged to have, with the intent to wound, caused bodily harm as charged in Count 2 as set out in Exhibit "A".

21. The provisions of the Criminal Code of Canada creating the offence of causing bodily harm with intent, Section 228, R.S.C. 1970, c. C-34, were in full force and effect on the date set out in Count 2 of Exhibit "A".

22. By virtue of the Statutes of Canada 1980-1981-1982, c. 125 (hereinafter cited: S.C. 1980-1981-1982, c. 125) s.17, which came into force on January 4,1983, the paragraph following subsection (c) namely "discharges a firearm, air gun or air pistol at or causes bodily harm in any way to any person, whether or not that person is the one mentioned in paragraph (a), (b), or (c), is guilty of an indictable offence and is liable to imprisonment for fourteen years." was repealed and the following substituted theretofor:

discharges a firearm, air gun or air pistol at any person, whether or not that person is the one mentioned in paragraph (a), (b) or (c), is guilty of an indictable offence and is liable to imprisonment for fourteen years.

23. In effect the substitution changed the character of the offence so that the section was only applicable where the bodily harm was caused by the discharge of a firearm, air gun or air pistol.

24. Furthermore, it is my professional opinion that the conduct which would constitute the crime as defined in Section 228 of the Criminal Code of Canada, R.S.C. 1970, c. C-34, is subsumed into the offence of aggravated assault provided by Section 245.2 of the Criminal Code of Canada which came into force on January 4, 1983.

25. By virtue of S.C. 1980-1981-1982, c. 125 s.19 the offence of Aggravated Assault was created. Section 245.2 of the Criminal Code of Canada, Revised Statutes of Canada 1970, Chapter C-34 (hereinafter cited: R.S.C. 1970, c. C-34) provides as follows:

Aggravated Assault

245.2 (1) Every one commits an aggravated assault who wounds, maims, disfigures or endangers the life of the complainant.
(2) Everyone who commits an aggravated assault is guilty of an indictable offence and is liable to imprisonment for fourteen years.

Section 245.2 aggravated assault captured those situations where the assault wounded, maimed, disfigured or endangered the life of the

complainant but was not caused by a firearm, air gun or pistol.

26. On December 12, 1988, the Revised Statutes of Canada 1985 came into force and thereby Section 245.2 of the Criminal Code of Canada, R.S.C. 1970, was re-enacted as Section 268 of the Criminal code of Canada, R.S.C. 1985, c. C-46 with a minor change such that the word "is" preceding the word "liable" was deleted and the words "a term not exceeding" were added preceding the word fourteen. Thus the new section which is in force today reads as follows:

> 268 (1) Every one commits an aggravated assault who wounds, maims, disfigures or endangers the life of the complainant.
> (2) Everyone who commits an aggravated assault is guilty of an indictable offence and liable to imprisonment for a term not exceeding fourteen years.

27. As mentioned in paragraph 12 above, in Canadian law, the repeal of a criminal offence does not affect the prosecution of an individual or any criminal proceeding with respect to such individual who is alleged to have committed such criminal offence while the statutory provisions creating the offence was in full force and effect. Therefore, there is no bar in Canadian law from commencing or continuing a criminal proceeding in relation to indictable criminal offences committed when the statutory provisions creating those indictable offences were in full force and effect.

28. It is my expert legal opinion that Section 35 of the Interpretation Act, R.S.C. 1970, c. I-23, (see paragraph 13 above) and Section 43 of the Interpretation Act, R.S.C. 1985, c. I-21, (see paragraph 14 above) preserves the validity of charges laid under Section 228 of the Criminal Code of Canada, R.S.C. 1970, c. C-34, relating to acts committed prior to January 4, 1983 and preserves the criminal proceedings against Wilbur James VENTLING with respect to Count 2 on Exhibit "A".

29. Because the conduct which would constitute the crime of causing bodily harm with intent was subsumed into the offence of aggravated assault as described in paragraph 26 above, the offence as set out in Count 2 of Exhibit "A" not only constituted a breach of the Criminal Code of Canada on the date set out in the Count, but continues to be a criminal offence.

30. Both the offences set out in Exhibit "A" are being prosecuted by Indictment. There is no limitation period in Canadian law on the prosecution of indictable offences. In my opinion, both the offences specified in Exhibit "A" have been properly laid and can be prosecuted with no defence available based on limitation period.

31. I have read the affidavit of Cst. Kevin Cyr, a peace officer and a regular member of the Royal Canadian Mounted Police stationed at Vernon British Columbia, Canada. Cst. Cyr is the current lead investigator and file coordinator with respect to the investigation of the offences contained in Exhibit "A".

32. That based on the affidavit of Cst. Cyr, and having prosecuted hundreds of criminal prosecutions, in my opinion there is a substantial likelihood of conviction on the charges contained in Exhibit "A"

33. I swear this Affidavit in support of an application to have Wilbur James VENTLING extradited from the United States of America and returned to Canada to answer to the charges set out in Exhibit "A", the Information filed herein, and to be dealt with according to law.


SWORN BEFORE ME:
at the City of Kelowna,                    )
Province of British Columbia,              )
this 27 day of November, 2007              )
                                           )
                                           )
                                           )
_____           _____
A Commissioner for taking                  David M. Ruse
Affidavits within British Columbia

**INFORMATION/DENONCIATION**

FORMAT CRIMINAL ARPS 2
PCR 004-G
REV./REV. 05-79

BRITISH COLUMBIA

| | |
|---|---|
| Court Identifier: | 4971 - P - R - A |
| Court File Number: | 33836 |
| Type Reference: | C |
| Info. Seq. Number: | 3 |
| Agency File Number: | 119:79-7377 |

DNA Primary: [X]   DNA Secondary: [ ]
K File: [ ]
SOR: [X]

CANADA:
PROVINCE OF BRITISH COLUMBIA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

Page 1 of 1                                    **"BY INDICTMENT"**

This is the information of / Les presentes constituent la denonciation de Constable K. Cyr 48242, a Peace Officer (the "informant" / le "denonciateur") of / de Vernon, British Columbia.

The informant says that the informant has reasonable and probable grounds to believe and does believe that / Le denonciateur declare qu'il a des motifs raisonnables et probables et croit effectivement que

Count 1

Wilbur James VENTLING aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, did have sexual intercourse with Tavin Christine SOMERSET, a female person not his wife, without her consent, and thereby did commit the offence of rape, contrary to Section 144 of the Criminal Code.

Count 2

Wilbur James VENTLING aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, with the intent to wound Tavin Christine SOMERSET, did cause bodily harm to Tavin Christine SOMERSET, contrary to Section 228 of the Criminal Code.

SWORN BEFORE ME / ASSERMENTE DEVANT MOI

ON / CE ___5-th___ DAY OF / JOUR DE

___June___, ___2007___.

AT / A Vernon,

BRITISH COLUMBIA / COLOMBIE-BRITANNIQUE

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

(SIGNATURE OF INFORMANT)
(SIGNATURE DU DENONCIATEUR)

_Warrant to issue - amend._

PROCESS CONFIRMED / ACTE DE PROCEDURE
CONFIRME

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

This is Exhibit " A " referred to in the
Affidavit of _DAVID M. RUSE_
Sworn before me at _KELOWNA B.C._
this _27TH_ day of _NOVEMBER_ 20_07_

_Paige E. Johnstone_
A Commissioner for taking
Affidavits for British Columbia

This photocopy is a true copy of the original
document which has not been altered in any
way.

JUSTICE OF THE PEACE
in and for the Province of British Columbia

B. HOLTSKOG

# Warrant for Arrest

Police File No.
119:79-7377

Court File No.
4971:33836-3-C

## In the Provincial Court

Canada: Province of British Columbia

Ban - none

Primary Enf. Agency:

D.O.B.: December 10, 1944

To the peace officers in the Province of British Columbia

Whereas Wilbur James Ventling
of N.N.C.C. (Prison), Carson City, Nevada, USA

(the "accused") has been charged with the following offence(s):

Count 1, on or about May 27, 1979, at or near Vernon, BC, did commit an offence of rape, contrary to section 144 Criminal Code.

Count 2, on or about May 27, 1979, at or near Vernon, BC, did commit an offence of cause bodily harm w/intent to wound/maim/disfigure, contrary to section 228(a) Criminal Code.

See a total of 2 Charges

This is Exhibit " *B* " referred to in the
Affidavit of *DAVID M. RUSE*
Sworn before me at *KELOWNA B.C.*
this *22nd* day of *November* 20 *02*
*Taigi L. Johnstone*
A Commissioner for taking
Affidavits for British Columbia

This photocopy is a true copy of the original
document which has not been altered in any
way.

**B. HOLTSKOG**
JUSTICE OF THE PEACE
In and for the Province of British Columbia

And whereas:

there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused

You are commanded, in Her Majesty's name, forthwith to arrest the accused and to bring him/her before any Justice/Judge in and for the Province of British Columbia to be dealt with according to law.

Dated / Fait le  June 5, 2007
at /à  Vernon
British Columbia /Colombie-Britannique

A Justice of the Peace in and for the Province of British Columbia / Un juge de paix
dans et pour la province de la Colombie-Britannique

## Endorsement of Warrant

CANADA: Province of  British Columbia - Form 29 (Section 507)  Whereas this warrant is issued under section 507, 508 or 512 of the *Criminal Code* in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 of that Act.

Dated

at                                                           British Columbia    A Justice of the Peace in and for the Province of British Columbia

| Warrant Cancelled (Return to Registry) | Warrant Executed (Return to Registry and attach original bail document if applicable) |
|---|---|
| by | by |
| Person contacted | Date |
| by phone at | |
| Date | |
| Reason □ Bail reinstated | |

PCR 014
Form 7
01/05    bh10:31-05 06.2007

Original: Police - Copies: Accused, File

(CC) Warrant for Arrest (adult)

# Mandat d'arrestation

À la cour provinciale

Nu. de dossier de la police
119:79-7377

Nu. de dossier du greffe
4971:33836-3-C

Canada : Province de la Colombie-Britannique

Ban - none

Org. prim. d'app. de la loi :

D.D.N. : December 10, 1944

Aux agents de la paix de la province de la Colombie-Britannique

Attendu que Wilbur James Ventling
de N.N.C.C. (Prison), Carson City, Nevada, USA

(le (la) "prévenu(e)") a été inculpé(e) de l'(des) infraction(s) suivante(s) :
Count 1, on or about May 27, 1979, at or near Vernon, BC, did commit an offence of rape, contrary to section 144 Criminal Code.

Count 2, on or about May 27, 1979, at or near Vernon, BC, did commit an offence of cause bodily harm w/intent to wound/ maim/disfigure, contrary to section 228(a) Criminal Code.

Voyez 2 inculpations

Et attendu :

there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused

Vous êtes enjoint(e), au nom de Sa Majesté, d'arrêter immédiatement ledit (ladite) prévenu(e) et de l'amener devant un juge de paix/ juge dans et pour la province de la Colombie-Britannique, pour qu'il (elle) doit traité(e) selon la loi.

## Visa du mandat

**CANADA: Province de la Colombie-Britannique - Formulaire 29** (Article 507)  Attendu que le présent mandat est décerné en vertu des articles 507, 508 ou 512 du *Code criminel*, relativement à une infraction autre que celles visées à l'article 522, j'autorise par les présentes la mise en liberté du prévenu en application de l'article 499 de cette loi.

Fait le

à                                              Colombie-Britannique

Un juge de paix dans et pour la province de la Colombie-Britannique

| Mandat annulé (Retourne au greffe) | Mandat exécuté (Retourner au greffe le plus tôt possible et y joindre le document original de mise en liberté sous caution s'il y a lieu |
|---|---|
| par | |
| Personne contactée | par |
| au téléphone à | |
| Date | Date |
| Raison | Cautionnement remis en vigueur | |

PCR 014
Form 7
01/05            bh10 31-05.06.2007

Original: Police - Copies: Accused, File

(CC) Mandat d'arrestation (adulte)

PROVINCE OF BRITISH COLUMBIA

CANADA

I HEREBY CERTIFY that the attached copy of the Affidavit of Kevin Joseph Cyr, sworn the 27th day of November, 2007 is a true and correct copy of the original document.

DATED at the City of Kelowna, Province of British Columbia, Canada, this 27th day of November, 2007.


*Paige L. Johnstone*

Paige Lyn Johnstone Q.C.,
A Commissioner for taking Affidavits
within the Province of British Columbia

| CANADA | ) | IN THE MATTER OF AN APPLICATION |
|---|---|---|
| | ) | FOR THE EXTRADITION FROM THE |
| | ) | UNITED STATES OF AMERICA TO |
| PROVINCE OF BRITISH COLUMBIA | ) | CANADA OF WILBUR JAMES VENTLING |
| | ) | WHO STANDS CHARGED IN CANADA |
| | ) | WITH THE OFFENCES OF RAPE AND |
| CITY OF VERNON | ) | CAUSING BODILY HARM WITH INTENT. |

## AFFIDAVIT

I, Kevin Joseph CYR, of the City of Vernon, in the Province of British Columbia, MAKE OATH AND SAY AS FOLLOWS:

1.    That I, Constable Kevin Joseph CYR, am a Police Officer and have been a member of the Royal Canadian Mounted Police (hereinafter referred to as the RCMP) for seven years. I am presently attached to the General Investigation Section of the Vernon RCMP Detachment in the City of Vernon in the Province of British Columbia.

2.    I have personal knowledge of the matters and facts hereinafter to which I depose in this Affidavit, save and except where such facts are stated to be on information and belief. In such case, I verily believe them to be true.

3.    The following paragraphs relate to the sexual assault of Tavin Christine SOMERSET ('SOMERSET") on May 27, 1979 alleged to have been committed by Wilbur James VENTLING ("VENTLING"), date of birth December 10, 1944, also known as John James STEWART ("STEWART").   At the time of the incident, SOMERSET was nine (9) years old.

4.    I personally became involved in this investigation on November 8, 2005. I was assigned the role of lead investigator and tasked with completing the investigation. In order to fulfill this role I have reviewed the investigative file in its entirety, including all investigation reports, statements, exhibit reports, forensic and laboratory reports and scene photographs. I have also re-interviewed some witnesses, witnessed the arrest of VENTLING, took photographs of VENTLING following his arrest, and observed a DNA sample be taken from VENTLING after his arrest.

1

## SUMMARY

5.    Based on the details contained below, I believe the following:

a.    On May 27, 1979, Tavin Christine SOMERSET, who was nine years old, was lured by a male to a wooded area in Vernon, B.C. The male sexually assaulted SOMERSET and ejaculated in her vagina. SOMERSET sustained serious vaginal injuries as a result of the sexual assault. The male fled the scene. The male left behind a napkin that had a bloody fingerprint on it. There was DNA recovered at the scene and from clothing of the victim. (as I read the Biology report – no male DNA was found in the vaginal swab of the victim and the way this was worded the inference was Male DNA was found there)

b.    A suspect by the name of John James STEWART was identified as a suspect in a series of similar assaults in the Calgary area ("the Calgary investigation").

c.    On September 8, 1979, STEWART was arrested in Taber, Alberta, in relation to the Calgary investigation.

d.    On September 9, 1979, STEWART's fingerprints were taken.

e.    On September 10, 1979, the fingerprints taken from STEWART were matched to the bloody fingerprint left at the SOMERSET crime scene. There has since been some disagreement amongst forensic specialists as to whether or not the bloody fingerprint is sufficient for identification purposes but two fingerprint experts have confirmed the match.

f.    On September 17, 1979, STEWART was remanded for a psychiatric examination.

g.    On September 18, 1979, STEWART escaped from the psychiatric facility he was being held at in Alberta and fled to the USA.

h.    On September 27, 1979, the fingerprints obtained from "STEWART" showed that STEWART was actually Wilbur James VENTLING who was, at the time, wanted for escaping a state hospital in Colorado where he had been serving an indefinite term at the Forensic Unit for the Criminally Insane.

i.    In October of 1979 VENTLING was arrested in Las Vegas on other sexual assault charges and received a sentence of 40 years. He appealed the sentence and was subsequently released in 1997.

2

j.    In 2004, a DNA profile of "Male 1" was obtained from DNA left at the SOMERSET crime scene.

k.    In 2005, this profile was compared against the State of Nevada DNA Database and was found to match the offender profile of Wilbur James VENTLING.

l.    On October 9, 2007, VENTLING was arrested in Carson City, Nevada by the U.S. Marshals pursuant to a request for his arrest pending an extradition application.

m.    On October 9, 2007, a DNA sample was taken from VENTLING. This DNA sample was turned over to me and I sent it to the RCMP Forensic Laboratory.

n.    On November 7, 2007, the DNA sample taken from VENTLING was matched to the profile of "Male 1" obtained from the SOMERSET crime scene. The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 42 billion.

o.    On November 2, 2007, Tavin SOMERSET provided a statement that on May 27, 1979, when she was nine years old, she had just left swimming when she was approached by a male who wanted assistance looking for his cat. The male and SOMERSET walked to a secluded area and the male took her clothes off, held her sweater over her face, and vaginally raped her.

## INVESTIGATIVE DETAILS:

6.    I have read an occurrence report dated May 27, 1979 signed by dispatcher Kyle DUNCAN which stated that on that date at 11:30 hours Mrs. BRODLAND of 4210 Old Kamloops Road, Vernon, in the Province of British Columbia called to report that a nine year old girl named Christine SOMERSET had come to Mrs. BRODLAND's house and said she had been raped. Mrs. BRODLAND reported that the female was bleeding from her vaginal area.

7.    I have read an Investigation Report prepared by Cst. Gary ARDIEL, who was at the time a member of the RCMP posted to the Vernon Detachment and assigned as lead investigator for the file. Although the report is undated, based on the context of the report I believe it to relate to the events of May 27, 1979. The report stated that (on that date):

a.    At 11:35 hours Cst. ARDIEL attended to the Vernon Hospital and spoke with SOMERSET. SOMERSET told Cst. ARDIEL that she met a male near the Rec Centre. The male claimed to have lost his cat and asked SOMERSET to help look for it. SOMERSET told Cst. ARDIEL that she was with the male for

3

      approximately 1 hour before the rape and that the rape occurred directly up the hill from the house where she had attended to report the offence (the BRODLAND residence).

b.      SOMERSET further stated that the male put her red sweater over her eyes while he removed one leg of her pants. The male did not strike SOMERSET but threatened to smother her if she screamed. SOMERSET said she left her red sweater at the scene.

c.      Cst. ARDIEL reported that SOMERSET was in a great deal of pain and was unable or unwilling to relate most of the details of the event.

c.      At 12:13 hours Dr. SPILLER arrived and spoke with SOMERSET and her mother. At 12:26 hours Dr. SPILLER commenced his examination.

e.      At 12:37 hours Nurse Pat NOLAN ("NOLAN") turned over SOMERSET's blue flowered tank top and blue and pink plaid slacks which NOLAN had personally removed from the victim and packaged. NOLAN gave these items to Cst. ARDIEL. These were named Exhibit Item A and B respectively.

f.      At 12:42 hours Cst. ARDIEL received a test tube containing a blood clot and swab taken by Dr. SPILLER from the vagina of SOMERSET. This was named Exhibit Item E. Dr. SPILLER told Cst. ARDIEL that SOMERSET was severely torn and ripped and he required a surgeon to treat the injuries.

g.      At 13:01 hours Dr. SPILLER turned over a small blade of grass located in SOMERSET's vulva. This was named Exhibit Item F.

h.      At 13:25 hours Cst. ARDIEL attended the scene where SOMERSET was believed to have been assaulted. Cst. ARDIEL examined the scene with Forensic Identification Member Cpl. LYNCH-STAUNTON.

i.      Cst. ARDIEL located four Diary Queen napkins, one of which was soaked with blood (hereinafter referred to as "the bloody napkin"). These were named Exhibit Items H, I, and J.

j.      Cst. ARDIEL also located a red sweater, which was seized and named Exhibit Item G.

k.      Cst. ARDIEL also seized three samples of blood soaked grass from the scene, which were named Exhibit Items K, L, and M.

l.      Cst. ARDIEL observed that a bowel movement was also located near by.

m.   At 15:43 hours Cst. ARDIEL completed the scene examination.

n.   Neighborhood enquiries were done but did not result in any significant new information being obtained.

8.   I have read a Forensic Identification Report prepared by Cpl. LYNCH-STAUNTON dated May 27, 1979. The report stated that Cpl. LYNCH-STAUNTON attended the scene with Cst. ARDIEL and did a sketch of the area.  He then performed an examination of napkins that were found at the scene.  Cpl. LYNCH-STAUNTON located one latent fingerprint impression on the napkin that he could compare against a suspect fingerprint.

9.   I have reviewed notes of Cst. Debbie FISHER of the Vernon RCMP dated May 28, 1979 pertaining to her interview with SOMERSET.   Although the notes don't explicitly state it, from the context of the notes, I believe the notes to be a record of what SOMERSET stated to Cst. FISHER, which was the following:

a.   SOMERSET met the suspect at the Rec Centre. The male said that he had lost his Siamese kitten and asked her to help him find it.  The male said there was a ten dollar reward if she found it.

b.   SOMERSET and the male walked together up the hill behind the curling rink and looked.  The male pointed towards Alexis Park Drive and told SOMERSET that there were a lot of caves and trees behind there and that he would give her another twenty dollars if she came there to look for the kitten.  The male told her to go ahead and he would meet her behind "Tumbleweed" (apartments). SOMERSET went behind the Tumbleweed apartments.   The male arrived there shortly after.

c.   Once behind Tumbleweed apartments they walked up the hill by a large (irrigation) pipe.  After they walked some distance he sat her down and asked her what colour her underpants were.  SOMERSET told him that she didn't have any on so they were all in the wash.  The male then placed his hand over her mouth and held it tightly.  The male told SOMERSET to take one leg out of her pants.  SOMERSET took her pants off then.

d.   The male told SOMERSET that he would smother her if she screamed or did anything foolish.  The male then took SOMERSET's sweater and wrapped it around her head.  SOMERSET could not see anything.

e.   SOMERSET said she could not remember much about his attack.  SOMERSET saw the male doing up his pants.  The male told SOMERSET that he would see her again at the Rec Centre and give her the money.  SOMERSET said the male had Diary Queen papers and she felt him wipe her off.

5

f.      SOMERSET had a bowel movement after he was through.  The male left and a few minutes later she ran down to the house.

g.      SOMERSET described the male as 30 to 35 years old, ear length blonde hair that was curly at the ends, fair skinned, about 5'10" tall, of medium build.  The male told SOMERSET he was 19 and went to college.

10.     I have reviewed the entire investigative file and ascertained that between the date of the offence, May 27, 1979, and June 12, 1979 numerous possible suspects were identified through tips from the public, checks of known sex offenders, and other police investigation.  Most of the potential suspects were eliminated because their physical description did not match that given by SOMERSET, through the passing of a polygraph examination, or through photo line ups presented to SOMERSET.

11.     I have reviewed a Investigation Report dated June 12, 1979.  There is no indication on the report as to who the author was.  The report stated that Cpl. Al SISMEY of the Calgary RCMP notified the Vernon RCMP that they were investigating a series of indecent assaults in the High River, Alberta area where a male suspect lured young girls into wooded areas under the pretext of looking for a lost dog.  Cpl. SISMEY further advised that they had identified a suspect named John James STEWART, with a date of birth of September 20, 1948 ("STEWART").  Cpl. SISMEY advised that STEWART is from Calgary but moved to Kelowna around March 19, 1979.

12.     I have reviewed a memorandum dated April 27, 1979 (ie. before the SOMERSET assault) from Cst. RODWELL of the Calgary RCMP to the Kelowna RCMP detachment.  In the memo, Cst. RODWELL advises that the Calgary RCMP was investigating the assault of nine young girls (ages 8 to 13) in the Calgary area.  The suspect's modus operandi was to lure his victims into the bush area by offering a reward to help him look for a dog or other article.  The suspect then assaulted the girls.

The memo requested that Kelowna RCMP attempt to locate and discreetly photograph John James STEWART as he had come to light as a possible suspect in the investigation and that STEWART was believed to be in the Kelowna area and banking at a Kelowna bank.

a.      Based on my review of the file, I understand that STEWART was first identified as a suspect in the SOMERSET investigation based on his being a suspect in the Calgary investigation.

13.     Review of the file indicates that between June 12, 1979 and August 7, 1979, police continued to investigate other suspects as they were identified.

6

14. I have read a report prepared by Cst. ARDIEL dated September 20, 1979. The report indicated that on September 8, 1979, STEWART was arrested by the Taber Police. On September 9, 1979 Cst. ARDIEL attended Taber, Alberta and obtained fingerprints from STEWART. STEWART was interrogated by Cst. ARDIEL but did not make any admissions.

15. I have read a Forensic Identification Report prepared by Cpl. LYNCH-STAUNTON dated September 10, 1979. The report states that Cst. ARDIEL provided him with the fingerprints taken from STEWART. Cpl. LYNCH-STAUNTON positively identified the suspect STEWART's left ring fingerprint to the latent fingerprint impression that was found on the bloody napkin taken from the scene.

16. I have read a report dated September 20, 1979 prepared by Cst. ARDIEL which indicated that on September 17, 1979, STEWART was remanded for a psychiatric examination. The report further stated that on September 18, 1979, STEWART escaped from the psychiatric unit of the Calgary General Hospital.

17. I have read a report dated September 27, 1979 prepared by Cpl. MacMILLAN of the Vancouver RCMP Crime Index Section. The report stated that Cpl. MACMILLAN found that the fingerprints that had been obtained from STEWART resulted in the determination that "STEWART" was in fact Wilburn James VENTLING [sic] who was wanted out of Colorado.

18. I have read a report dated October 1979 prepared by Cst. ARDIEL. The report stated that following the identification of STEWART as VENTLING, it was discovered that VENTLING was wanted for escape from a State Hospital in Colorado where he had been serving an indefinite term at the Forensic Unit for the Criminally Insane.

19. I have read a report dated October 22, 1979 prepared by Cst. ARDIEL which stated that on October 19, 1979, VENTLING was arrested in Las Vegas for kidnaping, lewdness with a minor under 14 years and attempt sexual assault.

20. I have read a report dated April 8, 1980, prepared by Cst. ARDIEL which stated that on February 11, 1980, VENTLING pleaded guilty to two counts of lewdness with a minor and one count of attempted sexual assault. He was sentenced to 40 years at the Carson City State Penitentiary.

21. I have read a report dated May 19, 1993 prepared by Cst. Al LEES of the Vernon RCMP which stated that on that date he contacted the Nevada Prison and was told that VENTLING was in prison serving a 20 year term. VENTLING's parole date was February 25, 1997. His release date was November 16, 2004.

22.   I have read a report that was undated and prepared by Cpl. THOMPSON of the Vernon RCMP which stated that on April 23, 1997, he contacted Jane SULLIVAN of the Colorado Prison System who told him that originally VENTLING was to be released in the year 2004 but he appealed one of his convictions and had his sentence reduced to 16 years and 1 day.   Cpl. THOMPSON was further advised that VENTLING was to be released on September 2, 1997.

## MEDICAL RECORDS:

23.   I have reviewed a medical record history sheet of (Tavin) Christine SOMERSET prepared by Dr. SPILLER on May 27, 1979 which stated that:

   a.   The nine year old patient was admitted from the Emergency Room on May 27, 1979 where she presented with an extensive perineal and vaginal laceration secondary to a sexual assault.

   b.   There were some markings on her skin, particularly over her right upper arm, which were considered to have been incurred during her attack.

   c.   A two inch tear in the perineum which extended up into the lateral vaginal wall involving a small artery which was pumping blood was located.  The tear had gone through the perineal muscles but had not extended into the rectum.

   d.   Dr. SPILLER was unable to control the bleeding and he had to call Dr. JONES for assistance.

24.   I have reviewed an Operation Report prepared by Dr. JONES on May 27, 1979 pertaining to (Tavin) Christine SOMERSET.  The report stated that:

   a.   Dr. JONES was asked to see SOMERSET at the request of Dr. SPILLER.

   b.   On examination of the perineum there was a laceration extending down from the posterior fourchette to within 1 centimeter or so of the anterior anal margin. The anterior portion of the anal sphincter had been torn as well but it did not extend through the whole thickness of the anterior muscle.

   c.   Dr. JONES sutured the injuries.

8

**WITNESS STATEMENTS:**

25.  On February 15, 2006, I obtained a witness statement from Charmaine BRODLAND. BRODLAND stated that:

a.  On May 27, 1979 she was outside of her house on Old Kamloops Road in Vernon. A little girl came down off the mountain and was obviously upset. BRODLAND took her into the house and asked her what happened.

b.  The girl told BRODLAND that a male asked her to help him find his lost kitten. The girl said she went up on the hillside looking for the cat and at that time the male raped her.

c.  The girl said her name was Christina SOMERSET. SOMERSET asked BRODLAND if she could take a bath. BRODLAND told her not too.

d.  SOMERSET also told BRODLAND that her panties and a kleenex were up by the tree.

e.  BRODLAND could not remember if she phoned the police or SOMERSET's mother but that SOMERSET's mother and the police attended the residence. BRODLAND stated the police drove SOMERSET to the hospital.

26.  On February 9, 2006, I obtained a statement from Patricia NOLAN, who was a nurse at Vernon Jubilee Hospital on May 7, 1979 and who attended to SOMERSET. NOLAN stated the following:

a.  She was working in the Emergency room and her duties included receiving patients attending the hospital.

b.  The ambulance attendants had called before hand advising they were bringing a rape victim in. The ambulance arrived with the victim and the police arrived shortly after.

c.  She was bleeding and was taken to the operating room. The victim lost approximately 500 milliliters of blood, which would be a significant loss for a victim of that age and size.

d.  The rape procedure that the hospital followed at the time entailed the nurse taking the clothing from the victim and turning it over to the RCMP along with various swabs being taken. NOLAN did not specifically remember taking the clothing from the victim, but knows that the rape procedure was stringently

9

followed in every case. The victim's clothes were removed and handed over to the RCMP.

e.  NOLAN remembered the incident because at the time her own daughter was the same age as the victim.

27.  On February 6, 2006, I obtained a statement from Dr. Graham SPILLER, who was one of the physicians who treated SOMERSET on May 27, 1979. I provided Dr. SPILLER with a copy of the medical report pertaining to SOMERSET's injuries on May 27, 1979. Dr. SPILLER stated that:

a.  He did not recall that specific incident with the exception that he did remember having to call a gynecologist, Dr. JONES, due to the bleeding and tissue damage.

b.  He recognized the reports as his. At the time he was performing most of the rape investigations. It was his practice to accurately report the injuries observed and the treatment provided in the medical records.

c.  Dr. SPILLER reviewed his medical reports and noted the following:

   i.  SOMERSET was nine years old, was pre-pubescent, and appeared to be of average intelligence. She did not seem intoxicated.

   ii.  SOMERSET stated that a male had offered her money to go with him, and then assaulted her by pulling her sweater above her head to restrain her.

   iii.  There were small round red marks over the front of her arms which Dr. SPILLER concluded were caused by the attacker's thumbs.

   iv.  SOMERSET was examined in the Emergency Room of Vernon Jubilee Hospital and was then taken to the operating room.

   v.  SOMERSET had a large laceration measuring about two inches in the vagina. Dr. SPILLER took SOMERSET to the operating room to treat the injury and noted a small artery that was pumping blood. Dr. SPILLER required expert help to treat the injury and called Dr. JONES, who was a gynecologist.

   vi.  During the procedure SOMERSET lost approximately one liter of blood.

10

    vii.    Dr. SPILLER took some specimens which he turned over to Cst. ARDIEL. He also handed over the pants, shoes, socks, shirt, and a sample of a blood clot from SOMERSET's vagina to Cst. ARDIEL. This was done without any break in the chain of evidence.

    viii.    Dr. SPILLER diagnosed SOMERSET with an extensive perineal (the area around the vagina) tear and skin marks on both arms suggesting physical restraint.

    ix.    There is nothing to suggest that the injuries would be caused by anything besides a sexual assault.

    x.    Dr. SPILLER characterized SOMERSET's injuries as an "extremely severe" injury to the perineal and the vagina.

28.    On February 8, 2006, I obtained a statement from Dr. Bryn JONES who was one of the physicians who treated SOMERSET on May 27, 1979. I provided Dr JONES with a copy of the medical reports pertaining to SOMERSET's injuries on May 27, 1979. Dr. SPILLER stated that:

    a.    He was an obstetrician and gynecologist at Vernon Jubilee Hospital in May of 1979. He did not remember the details of the incident but did remember the case because it involved such a small child.

    b.    He was called by Dr. SPILLER to assist in treating SOMERSET.

    c.    Dr. JONES reviewed his medical reports and noted the following:

        i.    Upon examination of SOMERSET he observed a laceration which extended from the posterior fourchette (the back margin of the vagina) to within a centimeter of the anal margin. Also, the laceration extended up into the vagina.

        ii.    He treated and sutured the injuries and was able to stop the bleeding.

    d.    I asked Dr. JONES what would be required to cause such an injury. Dr. JONES stated that the vagina would have to be stretched but could not comment on if a penis could cause the injury.

## FINGERPRINT ON THE BLOODY NAPKIN.

29.   I have read a report dated July 5, 1999, prepared by Sgt. FALLS, previously of the Vernon RCMP Forensic Identification Section.  In his report, Sgt. FALLS states that in July of 1999 he was asked to review the latent fingerprint impression on the bloody napkin and compare it to the known prints of STEWART.

30.   Sgt. FALLS' report indicates that he and Cpl. PAKENHAM, also of the Forensic Identification Section, reviewed the fingerprint and concluded that there is insufficient detail in the print on the bloody napkin to identify it to STEWART.

31.   Sgt. FALLS' report further states that he had Cpl. LYNCH-STAUNTON, who was retired but living in the area, attend the detachment and re-examine the print.  Cpl. LYNCH-STAUNTON confirmed his conclusion of the fingerprint matching but that "some of the points were weak".  Cpl. LYNCH-STAUNTON said that he would not be willing to provide evidence in court on the matter.

32.   Sgt. FALLS' report clearly concludes that, in his opinion, the latent fingerprint impression on the bloody napkin is not sufficient to be identified.

33.   I have reviewed a copy of a report dated September 13, 1999 prepared by Staff Sergeant MELLIS of the Regional Forensic Identification Section.  S/Sgt. MELLIS concluded that the photograph of the crime scene latent fingerprint impression in blood on the napkin was from the left ring finger of John J. STEWART (from the fingerprints that were obtained from STEWART on September 9, 1979 by Cst. Ardiel.)

S/Sgt. MELLIS further compared the fingerprints of STEWART that had been obtained on September 9, 1979 to fingerprints obtained from Las Vegas Metropolitan Police dated May 22, 2002 in the name of Wilbur James VENTLING with a date of birth of December 10, 1944.  S/Sgt. MELLIS concluded that VENTLING and STEWART were the same person based on the comparison of fingerprints.

34.   I have reviewed a report dated February 25, 2000 prepared by Staff Sergeant David ASHBAUGH, of the Forensic Identification Section.  S/Sgt. ASHBAUGH concluded that the latent fingerprint impression on the bloody napkin was made by the left ring finger of John J. STEWART(from the fingerprints that were obtained from STEWART on September 9, 1979 by Cst. Ardiel.)

12

**DNA:**

35.     I have reviewed a report dated March 11, 2003, prepared by Cst. JOHNSTON of the Vernon RCMP General Investigation Section. Cst. JOHNSTON's report indicated that on March 7, 2003 he forwarded several exhibits to the forensic laboratory for examination to attempt to obtain a DNA profile of the offender. Specifically, Cst. JOHNSTON forwarded the blue flowered tank top and slacks that were seized from SOMERSET when she attended the hospital after the assault (item A and B), a vaginal swab from the victim's vagina taken by Dr. SPILLER during the medical exam following the assault (item E), the victim's wool sweater which was recovered at the scene (Item G), and two samples of blood soaked grass from the scene (Items L and M).

36.     have reviewed a report dated June 28, 2004, prepared by Howard KALYN of the Biology Section of the RCMP Forensic Laboratory pertaining to his examination of the crime scene exhibits from Vernon RCMP file 1979-7377 (which is the file number for the investigation into the sex assault of SOMERSET). This report stated the following:

    a.     Exhibit Items A (blue flowered tank top), B (plaid slacks), E (vaginal swab and blood clot), G (red sweater), L (grass and leaf) and M (grass) were examined in order to generate DNA typing profiles. Interpretation of genetic profiles was conducted to determine any forensically significant associations among biological materials isolated from the exhibits.

    b.     Blood from Exhibit Item E (vaginal swab and blood clot) was taken to be the known sample of Tavin SOMERSET.

    c.     The DNA typing profiles obtained from the inside left arm of Exhibit Item G (red sweater) and L (grass and leaf) match that of the profile obtained from the known sample of SOMERSET (from Exhibit Item E). The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 170 trillion.

    d.     The DNA typing profiles obtained from the inside crotch of Exhibit Item B (plaid slacks) and the outside front and inside front of Exhibit Item G (red sweater) are of mixed origin consistent with having originated from two individuals. The male components of the DNA typing profiles obtained from these exhibits match one another and are consistent with having originated from an unknown male individual. This profile has been personally designated as **Male 1**. The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 42 billion. The female components of the DNA typing profiles obtained from these exhibits match the DNA profile obtained from the known sample of SOMERSET (from Exhibit Item E). The estimated probability of selecting an unrelated individual at

13

random from the Canadian Caucasian population with the same profile is 1 in 170 trillion.

e.     The DNA typing profiles obtained from the outside of side two of Exhibit Item A (blue flowered tank top) are of mixed origin consistent with having originated from two individuals. The male components of the DNA typing profiles obtained from these exhibits match the **Male 1** DNA profile. The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 42 billion.   The donor of the known sample of SOMERSET (from Exhibit Item E) cannot be excluded as a potential contributor to the female components of these mixed profiles.

f.     The DNA typing profiles obtained from Exhibit Item M (grass) is of mixed origin consistent with having originated from two individuals. The profile of the major component matches that of the known sample of SOMERSET (from Exhibit Item E). The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 170 trillion. The donor of the **Male 1** DNA typing profile cannot be excluded as a potential contributor to the minor component of this mixed profile.

g.     The DNA typing profiles obtained from the inside collar of Exhibit Item G (red sweater) and Exhibit Item M (grass) are of mixed origin consistent with having originated from at least two individuals with a minimum of one individual being a male. The profile of the major component matches that of the known sample of SOMERSET (from Exhibit Item E). The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 170 trillion. The trace component of this mixed DNA profile has limited genetic information and no meaningful comparison can be made to any samples.

h.     The DNA typing profile obtained from Exhibit Item A (blue flowered tank top) is of mixed origin consistent with having originated from at least two individuals with a minimum of one individual being a male. The profile of the female component matches that of the known sample of SOMERSET (from Exhibit Item E). The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 170 trillion. The trace component of this mixed DNA profile has limited genetic information and no meaningful comparison can be made to any samples.

i.     The partial DNA typing profile obtained from Exhibit Item M (grass) is of mixed origin consistent with having originated from at least two individuals with a minimum of one individual being a male. The donor of donor of the known sample from Exhibit Item E (SOMERSET) cannot be excluded as a potential contributor to this mixed DNA profile. The trace component of this mixed DNA

14

profile has limited genetic information and no meaningful comparison can be made to any samples.

j.    The partial DNA typing profile obtained from the outside of Exhibit Item A (blue flowered tank top) is of mixed origin consistent with having originated from two individuals. The donor of the known sample from Exhibit Item E (SOMERSET) cannot be excluded as a potential contributor to this mixed DNA profile. The donor of the **Male 1** DNA typing profile cannot be excluded as a potential contributor to the minor component of this mixed profile.

k.    The DNA typing profile obtained from the inside rear area of Exhibit Item B (plaid slacks) is of mixed origin consistent with having originated from three or more individuals. The donor of the known sample, from exhibit Item E (SOMERSET) cannot be excluded as a potential contributor to this mixed DNA profile. The donor of the **Male 1** DNA typing profile cannot be excluded as a potential contributor to the minor component of this mixed profile. The trace component of this mixed DNA profile has limited genetic information and no meaningful comparison can be made to any samples.

37.   I have read a request dated January 19, 2005, that Christine CROSSMAN of the RCMP Forensic Laboratory forwarded to Interpol for a DNA profile search.  The DNA profile pertaining to "Male 1" from Exhibit Item B of Vernon RCMP file 1979-7377 (which is the file number for the investigation into the sex assault of SOMERSET).

38.   I have read a report dated February 7, 2005, prepared by Jeffrey RIOLO, a Senior Criminalist with the Washoe County Sheriff's Office Forensic Science Division.  The report stated a keyboard search of the State of Nevada DNA Database showed a match between the DNA profile from the RCMP Sample # 1979-7377/Ex.B (plaid slacks) and Nevada convicted offender Wilbur VENTLING who has a date of birth of December 10, 1944.

39.   Jeffrey RIOLO's report further states that an evidentiary reference sample from Wilbur VENTLING would be needed to confirm the match.

40.   On May 3, 2006, I was advised by Jeffrey RIOLO that he made inquiries regarding VENTLING's file and determined that the DNA sample from VENTLING that was entered into the State of Nevada DNA database was obtained in 1997 by the Las Vegas Parole and Probation office but it is not known who took the sample.

15

**WARRANT OF ARREST:**

41.  On September 10, 1979, Cst. ARDIEL swore an information before Justice of the Peace NELSON and the following information was laid:

a.  John James STEWART, on or about the 27th day of May, A.D. 1979, at Vernon, in the Province of British Columbia, did have sexual intercourse with Tavin Christine SOMERSET, a female person not his wife without her consent, contrary to the form of statute in such case made and provided.

42.  On September 10, 1979, a warrant for STEWART's arrest was issued.

43.  On June 5, 2007, I swore an updated information before Justice of the Peace HOLTSKOG, a copy of which is attached to this affidavit as Exhibit "A", for the following charges:

a.  Wilbur James VENTLING, aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, did have sexual intercourse with Tavin Christine SOMERSET, a female person not his wife, without her consent, and thereby did commit the offence of rape, contrary to Section 144 of the Criminal Code.

b.  Wilbur James VENTLING, aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, with intent to wound Tavin Christine SOMERSET, did cause bodily harm to Tavin Christine SOMERSET, contrary to Section 228 of the Criminal Code.

44.  On June 5, 2007, a warrant for VENTLING's arrest was issued for the above offences. A copy of this warrant is attached as Exhibit "B".

45.  The Government of Canada requested the assistance of the United States of America for the provisional arrest pending this extradition application. A request under the Mutual Legal Assistance Treaty was also made to allow me to be present for the arrest of VENTLING, to take his photograph, to interview him, and to receive a DNA sample taken from VENTLING.

46.  On October 8, 2007, I traveled to Nevada to be personally present for the arrest of VENTLING.

47.  I was present on October 9, 2007, at 13:03 hours, when U.S. Marshal George SCHROEDER arrested VENTLING at his residence at 4708 August Drive, Carson City, Nevada pursuant to the request made in paragraph 45.

16

48. I took five photographs of VENTLING, including three photographs of his tattoos. Prior to taking these photos I observed VENTLING's driver's licence and sex offender registration card which identified him as Wilbur James VENTLING with a date of birth of December 10, 1944. The photographs on the identification matched VENTLING's appearance and VENTLING told me that he was Wilbur James VENTLING.

49. True copies of the five photographs that I took of Wilbur James VENTLING on October 9, 2007 are attached to this affidavit as Exhibits "C", "D", "E", "F", and "G". Specifically, the photographs depict the following:

    a. Exhibit "C" is a photograph depicting the upper torso and face of Wilbur James VENTLING.

    b. Exhibit "D" is a photograph depicting the face of Wilbur James VENTLING.

    c. Exhibit "E" is a photograph depicting a tattoo of a rose located on the right forearm of Wilbur James VENTLING.

    d. Exhibit "F" is a photograph depicting a tattoo of an eagle located on the left shoulder of Wilbur James Ventling.

    e. Exhibit "G" is a photograph depicting a tattoo of a skull and snake located on the right shoulder of Wilbur James VENTLING.

50. On October 9, 2007, at 13:25 hours, I watched Detective Bob MONTAMENPOUR of the Carson City Sheriff's office, obtained a buccal swab DNA sample from VENTLING pursuant to a DNA warrant issued pursuant to a Mutual Legal Assistance Treaty request.

51. After taking the DNA samples, Detective MONTAMENPOUR turned the VENTLING DNA samples over to me. I kept them in my custody and returned to Canada. On Friday, October 12, 2007, I sent the samples in a sealed envelope to the RCMP Forensic Laboratory for analysis and comparison to the DNA profile obtained from the SOMERSET crime scene exhibit.

52. I have reviewed a Forensic Laboratory Services Report dated November 7, 2007, authored by Brian BEEVERS, a Forensic Specialist of the Biology Section of the Vancouver Forensic Laboratory. The report pertains to the examination of the buccal swab taken from Wilbur VENTLING, which was designated as exhibit item #6, and a comparison with the DNA recovered from the SOMERSET crime scene exhibits. The report stated the following:

a.   The DNA typing profiles obtained from Exhibits B (plaid slacks [area AB; inside crotch]) and G (red sweater [areas AD: outside front and AF; inside Front]) are of mixed origin consistent with having originated from two individuals. The profile of the male components of the DNA typing profiles obtained from these exhibits match that of the known sample exhibit 6 (VENLTING, W). This profile was previously designated "Male 1". The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 42 billion. The profile of the female components of the DNA typing profiles obtained from these exhibits match that of the known sample exhibit E (SOMERSET, T.). The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 170 trillion.

b.   The DNA typing profiles obtained from Exhibits A (tank top [areas AC: outside, side 2]) and B (plaid slacks [area AA: outside rear left side]) are of mixed origin consistent with having originated from two individuals. The profile of the male components of the DNA typing profiles obtained from these exhibits match that of the known sample exhibit 6 (VENTLING, W.). The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 42 billion. The donor of the known sample, Exhibit E (SOMERSET, T.) cannot be excluded as a possible contributor to the female components of these mixed profiles.

c.   The DNA typing profile obtained from Exhibit M (grass [ area AB: stain from grass]) is of mixed origin consistent with having originated from two individuals. The profile of the major component matches that of the known sample, Exhibit E (SOMERSET, T.). The estimated probability of selecting an unrelated individual at random from the Canadian Caucasian population with the same profile is 1 in 170 trillion. The donor of exhibit 6 (VENTLIN, W [sic]) cannot be excluded as a possible contributor of the minor component of this mixed profile.

d.   The partial DNA typing profile obtained from Exhibit A (tank top [area AB: outside, side 2]) is of mixed origin consistent with having originated from two individuals. The donor of the known sample, Exhibit E (SOMERSET, T.) cannot be excluded as a possible contributor to the female component of this mixed profile. The donor of known sample, exhibit 6 (VENTLING, W) cannot be excluded as a possible contributor to the male component of this mixed profile.

e.   The DNA typing profile obtained from Exhibit B (plaid slacks [area AC: inside rear]) is of mixed origin consistent with having originated from three or more individuals. The donor of the known sample, exhibit E (SOMERSET, T) cannot be excluded as a possible contributor of the female component of this mixed profile. The donor of the known sample, exhibit 6 (VENTLING, W) cannot be

18

excluded as a possible contributor to the male component of this mixed profile. The trace component of this mixed DNA profile has limited genetic information and no meaning(ful) comparison can be made to any samples.

53.    On November 2, 2007, I obtained a statement from Tavin Christine SOMERSET. This statement was audio and video recorded. SOMERSET stated the following occurred on May 27, 1979 in Vernon, in the Province of British Columbia:

    a.    She had gone swimming at the pool at the recreation centre. She was outside of the recreation centre when she was approached by a male. She did not know him and he was a stranger to her.

    b.    The male wanted help looking for his lost cat. SOMERSET said that maybe she could help him. The male walked with SOMERSET up the hill to a secluded location.

    c.    SOMERSET sat down and said that she wanted to go home. The male told her she wasn't going anywhere. The male then told SOMERSET that he could guess what colour underwear she was wearing.

    d.    SOMERSET was scared because she only had pants, a t-shirt and a sweater on. SOMERSET said that she was not wearing any underwear because she had been swimming.

    e.    SOMERSET again said that she needed to go. The male said that she wasn't going anywhere. The male put his hands on SOMERSET's shoulders and pushed her down to the ground.

    f.    The male took SOMERSET's clothes off and put her sweater over top of her face. He took the rest of her clothes off. He said that he was going to do something to her and that he didn't want her to look until he counted to ten.

    g.    SOMERSET felt the male was manipulating her vagina somehow with his hands or mouth. SOMERSET still had her sweater over her face and the male said "do you want me to kill you"?

    h.    The male got on top of SOMERSET and penetrated her vagina. SOMERSET did not see what he penetrated her with, but did not see him holding any objects in his hands and when he penetrated her he was on top of her and her legs were open.

i.   SOMERSET threw the sweater off her face and punched him in the throat. The male put the sweater back over her face and said he was going to kill her and was going to smother her and leave her there. The sweater was over SOMERSET's face and the male had his hands on top of the sweater.

j.   The male said that he was going to get up and go and that he didn't want her to take the sweater off. SOMERSET stayed very still and thinks the male might have thought she was unconscious or dead.

k.   SOMERSET was in a great deal of pain. She then got up and headed down the side of the hill and found a house. The couple at the house was moving that day and assisted her. She told the couple that she had been raped and asked for help. She does not remember any further conversation she had with them.

l.   SOMERSET then went to the hospital.

54.   I swear this Affidavit in support of an application to have Wilbur James VENTLING extradited from the United States of America and returned to Canada to answer to the charges set out in Exhibit "A", the Information filed herein, and to be dealt with according to law.

SWORN BEFORE ME at the City of       )
Vernon, Province of British Columbia,   )
this 27th day of November, 2007        )
                                       )
_44838_                                )
A Commissioner for taking Affidavits   )   Kevin Joseph Cyr
within British Columbia                )

**INFORMATION/DENONCIATION**

FORM/FORMULAIRE 5
PCR 204-G
REV./RÉV. 05/03

BRITISH COLUMBIA

| | |
|---|---|
| Court Identifier: | 497 - P - R - A |
| Court File Number: | 33836 |
| Type Reference: | C |
| Info. Seq. Number: | 3 |
| Agency File Number: | 119.79-7377 |

DNA Primary: [X]    DNA Secondary: [ ]
K File: [ ]
SOR: [X]

CANADA:
PROVINCE OF BRITISH COLUMBIA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

Page 1 of 1                     **"BY INDICTMENT"**

This is the information of / Les presentes constituent la denonciation de Constable K. Cyr 48242, a Peace Officer (the "informant" / le "denonciateur") of / de Vernon, British Columbia.

The informant says that the informant has reasonable and probable grounds to believe and does believe that / Le denonciateur declare qu'il a des motifs raisonnables et probables et croit effectivement que

Count 1

Wilbur James VENTLING aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, did have sexual intercourse with Tavin Christine SOMERSET, a female person not his wife, without her consent, and thereby did commit the offence of rape, contrary to Section 144 of the Criminal Code.

Count 2

Wilbur James VENTLING aka John James STEWART, on or about the 27th day of May, 1979, at Vernon, in the Province of British Columbia, with the intent to wound Tavin Christine SOMERSET, did cause bodily harm to Tavin Christine SOMERSET, contrary to Section 228 of the Criminal Code.

SWORN BEFORE ME / ASSERMENTE DEVANT MOI

ON / CE ___5th___ DAY OF / JOUR DE

___June___, 2007.

AT / A Vernon,

BRITISH COLUMBIA / COLOMBIE-BRITANNIQUE

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

(SIGNATURE OF INFORMANT)
(SIGNATURE DU DENONCIATEUR)

_Warrant to issue - when_
PROCESS CONFIRMED / ACTE DE PROCEDURE
CONFIRME

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA
JUGE DE PAIX DANS ET POUR LA PROVINCE DE
LA COLOMBIE-BRITANNIQUE

This is Exhibit " A " referred to in the
affidavit of _Kevin Joseph Cyr_
sworn before me at _Vernon_
in the Province of British Columbia
this _27_ day of _November_, 2007

_____ 421838
A Commissioner for taking Affidavits
within the Province of British Columbia

# Warrant for Arrest

| | Police File No. | Court File No. |
|---|---|---|
| | 119:79-7377 | 4971:33836-3-C |

## In the Provincial Court

Canada: Province of British Columbia

Ban – none

Primary Enf. Agency:

D.O.B.: December 10, 1944

To the peace officers in the Province of British Columbia

Whereas Wilbur James Ventling
of N.N.C.C. (Prison), Carson City, Nevada, USA

(the "accused") has been charged with the following offence(s):

**Count 1, on or about May 27, 1979, at or near Vernon, BC, did commit an offence of rape, contrary to section 144 Criminal Code.**

**Count 2, on or about May 27, 1979, at or near Vernon, BC, did commit an offence of cause bodily harm w/intent to wound/ maim/disfigure, contrary to section 228(a) Criminal Code.**

See a total of 2 Charges

> This is Exhibit " B " referred to in the
> affidavit of _Kevin Joseph Cyr_
> sworn before me at _Vernon_
> in the Province of British Columbia
> this _27_ day of _November_ , 20 07
>
> _[signature]_ 44838
> A Commissioner for taking Affidavits
> within the Province of British Columbia

And whereas

there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused

You are commanded, in Her Majesty's name, forthwith to arrest the accused and to bring him/her before any Justice/Judge in and for the Province of British Columbia to be dealt with according to law.

Dated / Fait le  June 5, 2007

at /à  **Vernon**

British Columbia /Colombie-Britannique

_[signature]_
A Justice of the Peace in and for the Province of British Columbia / Un juge de paix dans et pour la province de la Colombie-Britannique

---

**Endorsement of Warrant**

**CANADA: Province of British Columbia - Form 29 (Section 507)** Whereas this warrant is issued under section 507, 508 or 512 of the *Criminal Code* in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 of that Act.

Dated

at

British Columbia

A Justice of the Peace in and for the Province of British Columbia

| Warrant Cancelled (Return to Registry) | Warrant Executed (Return to Registry and attach original bail document if applicable) |
|---|---|
| by | by |
| Person contacted | Date |
| by phone at | |
| Date | |
| Reason ☐ Bail reinstated | |

PCR 014
Form 7
01/05    bh10.31-05.06.2007

Original: Police - Copies: Accused, File

(CC) Warrant for Arrest (adult)



This is Exhibit " C " referred to in the

affidavit of _Kevin Joseph Cyr_

sworn before me at _Vernon_

in the Province of British Columbia

this _27_ day of _November_, 20_07_

_Kolibaba_ 44838

A Commissioner for taking Affidavits
within the Province of British Columbia



This is Exhibit " D " referred to in the
affidavit of _Kevin Joseph Cyr_
sworn before me at _Vernon_
in the Province of British Columbia
this _27_ day of _November_, 20_07_

_44838_

A Commissioner for taking Affidavits
within the Province of British Columbia



This is Exhibit " E " referred to in the
affidavit of _Kevin Joseph Cyr_
sworn before me at _Vernon_
In the Province of British Columbia
this _27_ day of _November_, 20_07_

A Commissioner for taking Affidavits
within the Province of British Columbia